


IN THE WESTERN DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, ex rel.,
BRIAN BUCHANAN

Plaintiff,

v.

SOUTH UNIVERSITY ONLINE
and EDUCATION MANAGEMENT
CORPORATION,

Defendants.

Civil Action

No. 07-0971

JURY TRIAL DEMANDED

**CIVIL COMPLAINT**

Plaintiff/Relator, Brian T. Buchanan, by undersigned counsel files this False Claims Act Complaint and in support alleges the following:

**I. Plaintiff**

1. *Qui Tam* Plaintiff/Relator Brian T. Buchanan is a citizen of the United States of America who resides at 5834 Maeburn Road, Pittsburgh, PA 15217. Buchanan worked for Defendant from December 2005 until May 2007 as an admissions representative. During his employment as an admissions representative, Buchanan held the positions of assistant director of admissions and associate director/project associate of admissions.

2. The United States of America is named as Plaintiff in this action because Federal Funds of the United States of America were/are awarded to Defendant, pursuant to Title IV of the Higher Education Act ("HEA") of 1965, as amended 20 U.S.C. §§ 1070 *et seq.* and 42 U.S.C. §§ 2751 *et seq.*, as a result of the false claims alleged in this complaint.

## II. Defendant

3. Defendant, South University Online ("SUO"), is located at Online Student Support Center, 1400 Penn Ave. Pittsburgh, PA 15222. Defendant SUO is a wholly owned subsidiary of Education Management Corporation. ("EDMC").

4. Defendant SUO is a proprietary institute of higher education, accredited by the Southern Association of Colleges and Schools (SACS). Defendant is a recipient of Title IV, HEA federal student financial aid funds from the United States Department of Education. ("DOE").

5. Defendant, Education Management Corporation ("EDMC"), is located at 210 Sixth Avenue, 33rd Floor Pittsburgh, PA 15222. EDMC owns more than 75 proprietary schools, including, but not limited to, Defendant SUO.

## III. Jurisdiction and Venue

6. The jurisdiction of this court is invoked pursuant to the False Claims Act, 31 U.S.C. §§ 3730(b)(1) and 28 U.S.C. § 1331.

7. This action seeks remedies on behalf of the United States for violations of 31 U.S.C. §§ 3729, *et seq.* by Defendants, specifically Defendants' wrongful act of fraudulently obtaining funds from the United States DOE in violation of Title IV of the HEA.

8. Relator Buchanan has satisfied all procedural and administrative requirements as required under the False Claims Act, 31 U.S.C. § 3730(b)(2), because when Relator Buchanan filed this Complaint he simultaneously provided to the United States Attorney for the Western District of Pennsylvania a disclosure statement of all material evidence and information related in this Complaint. This disclosure statement supports the existence of Defendants' submission of a knowingly false or fraudulent claim for payment or approval, under the False Claims Act, 31 U.S.C.

§ 3729.

## IV. Background

9. The United States Government awards billions each year to help students obtain education at colleges, universities, and proprietary schools. Students do not directly receive the Federal Funds; rather, the educational institution requests funds from the DOE or a third party intermediary lender. The DOE or third party intermediary lender then wires the funds directly into the institution's accounts, at which time, the institution credits its students for tuition.

10. Students are responsible for repaying the United States Government once they graduate or stop attending the institution. Oftentimes, students who are unable to complete their education are forced into dire economic situations.

## V. Introduction

11. This is an action pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* to recover damages and civil penalties on behalf of the United States arising out of false claims approved and presented by Defendants to obtain Federal Funds from the United States DOE in violation of the HEA, from at least 2005 continually through the present.

12. From at least 2005, though Relator Buchanan suspects Defendants' illegal practices began much earlier, Defendants represented to the DOE that they were in compliance with Title IV of the HEA.

13. However, Defendants have and continue to have actual knowledge that they are not adhering to Title IV of the HEA; that their representations of adherence are false; and that they are submitting false and/or fraudulent representations of compliance.

## VI. Summary of Defendants' Fraudulent Conduct.

**A. Defendants Intentionally and Fraudulently Failed to Adhere to the Mandatory Participant Agreement of Higher Education Act, Title IV.**

14. Defendants have requested and continue to request HEA funds for students through several programs, including, but not limited to, the Federal Pell Grant Program and Stafford Loans.

15. For Defendants to be eligible for these Federal Funds, federal statutes and federal regulations mandate Defendants certify to the United States Government that they will comply with Title IV of the HEA.

16. Accordingly, Defendants are required to execute a Program Participant Agreement (PPA), under which they must agree to and adhere to *inter alia* the following provisions:

> [The institution] *will not* provide any commission, bonus, or other incentive program based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of Title IV, HEA program funds... 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22)(i).

**1. Defendants' Admission Representatives Salaries are Directly Contingent on Their Ability to Secure Enrollment.**

17. Defendants, in violation of the PPA requirements of the HEA commission ban, base admissions representatives' salaries on their ability to secure enrollment. For admissions representatives, securing enrollment requires "seating students." Generally, seating a student means an admissions representative must do whatever it takes to ensure that a prospective student[1] completes the appropriate application and financial aid paperwork; passes a CPT (Computer

[1] Defendants refer to prospective students as "leads."

Placement Test)/Accuplacer admissions test[2]; and completes three assignments within seven days of the class starting.

18. Defendants cannot draw from a student's Title IV Federal Funds until the admissions representatives "seat" that student. Accordingly, Defendants instruct admission representatives to "seat" students at all costs.

19. For example, Defendants' admissions representatives, including Relator Buchanan, are/were trained to walk prospective students/leads through the application and federal aid paperwork, i.e. the admissions representative (who is *not* a financial aid representative) walks prospective students/leads through the promissory note.

20. Defendants manipulate the CPT/Accuplacer admissions testing process. Defendants do not reprimand admissions representatives who openly coach prospective student/leads through the CPT/Accuplacer admissions test. Moreover, although it is mandated that CPT tests be proctored by a non-family members, Defendants permit admission representatives to submit fraudulent proctor forms. In addition, Defendant SUO allows prospective students/leads to repeatedly take the CPT test until they get a passing score despite the required "three attempt" limit in one year. Finally, Defendant SUO will not discipline an admissions representative who takes the CPT test for the prospective student/lead if that admissions representative is making his numbers. Defendants will also manipulate prospective students transcripts to achieve an admissible GPA.

21. Defendant SUO encourages admissions representatives to "walk" students through

---

[2] If a prospective student/lead cannot pass the CPT/Accuplacer test, and the admissions representative is unable to manipulate the CPT/Accuplacer test, then Defendants instruct admissions representatives to use the prospective student's SAT scores as a substitute for the CPT/Accuplacer test score. Defendants will admit prospective students/leads with SAT scores as low as a combined 650.

the first three assignment within seven days of the start of class.

22. As a result, Federal Funds are provided for fraudulently "enrolled" students, i.e. students who are not qualified. Many "seated" students will derive little benefit from the education, will likely have to "drop out," and will be unable or unwilling to repay the federally guaranteed loans.

23. Defendants are aware they are violating the PPA requirements of the HEA. For example, when an accreditation agency visits one of Defendant EDMC's sites, Defendant EDMC demands that all admissions representatives remove any evidence of sales figures, salary matrixes, student seated goals,[3] and/or anything that could be construed as "sales materials," including sales training e-mails.

**2. Defendants Provide Incentives for Admissions Representatives who Secure Enrollment.**

24. In further violation of the PPA of the HEA, Defendant's offers incentives to admission representatives who successfully enroll students/seat students.

25. Defendants award admission representatives who are the "top producers" with "President Club" membership. President club members are rewarded with trips to foreign beach resorts where they receive prizes ranging from gift cards to iPods.

26. Defendants also award admissions representatives who seat the most students out of his training class with "Circle of Achievement" membership. Circle of achievement members are

[3] Defendants encourage admissions representatives to set student enrollment/seating goals. Each admissions representative is to think of something he/she has always wanted such as a BMW or a trip to the Carribean. For Relator, Buchanan, it was a Mercedes Benz G-Wagon. Then, based on Defendants' salary matrix, the admissions representatives are to compute how many students they would have to seat to achieve this goal. Defendants tell admissions representatives to post their student goals in their cubicles for motivational purposes; however, Defendants require administrative representatives destroy any evidence of these goals when an accreditation agency visits one of its locations or else he/she will be fired.

rewarded with expensive, free lunches and awards with their names and achievements stenciled on them.

**3. Defendants Fire Admissions Representatives Who Do Not Make Their Numbers.**

27. Defendants also violate the PPA of the HEA because they terminate admissions representatives who do make their numbers. If an admissions representative fails to make his numbers Defendants will push him out. This "pushing-out" process consists of berating the admissions representative; telling the admissions representative that he is a failure; telling the admissions representatives' co-workers that he is a cancer; placing this admissions representative on an unreasonable performance improvement plan (PIP); and if somehow the beleaguered admissions representative has not quit then Defendants will fire the admissions representative.

28. Defendants are aware they are violating the PPA requirements of the HEA when they fire admissions representatives for not making their numbers, i.e. seating students. Defendants' directors of admissions often stated in Relator Buchanan's presence that they wanted to fire certain administrative representatives who were not making their numbers but because this was not legal they would have to "come up" with a different reason.

**4. Defendants Actively Recruit Prospective Students/Leads.**

29. Moreover, Defendants, in direct violation of the PPA requirements of the HEA, actively recruit prospective students/leads regardless of these students' qualifications.

30. The most common way Defendants recruit prospective students/leads is the following: Admissions representatives receive lists of prospective students/leads from a vendor. Typically these lists are comprised of people who have signed up for free things on the internet

ranging from vacations to x-boxes. From these lists, Defendants instruct admissions representatives to engage in call blitzes, i.e. call the names of the people on these lists repeatedly in an attempt to recruit them.

32. As part of the recruitment process, Defendants instruct admission representatives to invoke the "bring the pain" tactic, which entails identifying the prospective student/lead's pain and exploiting it. For example, Defendants told Buchanan that if a prospective student/lead were a single mother then the admissions representative should say, "How are you going to explain to your children that you cannot buy them the things they need because you couldn't be *bothered* to finish your education..." or, "Do you *honestly* think that your children are ever going to go to college and graduate after watching their mother *never even* try to finish hers?

33. In addition, to recruit the most students, Defendants train admission representatives to rely heavily on sales tactics. During Relator Buchanan's time as an associate director/project associate, Defendants encouraged him to provide his admissions' team members with information regarding how to improve their sales tactics. In compliance with Defendants' request, Relator Buchanan inundated his team with sales tip e-mails with such titles as: "More on Sales Goals...The perennial Secret To Sales Success;" "Ten Secrets of Top Closers;" "How you Can Avoid the Worst Mistake Made by Sales Pros;" "Seven Keys to Effective Daily Living, Leading and Selling;" "The 8 Steps to Success in Selling;" "Find the Buying Motive;" "Double Your Students with this one Technique."

34. In conclusion, when Defendants request, receive and retain government-insured loan funds, Defendants know they are ineligible for those funds because of their intentional unwillingness to adhere to the PPA, i.e. Defendants have knowingly violated the HEA's commission ban, incentive

compensation ban, and the recruitment ban.

**B. Defendants, With Knowledge, Falsely Represent Themselves as Eligible under the HEA.**

35. Under the HEA, in order for an institution to be "eligible" for federal funding, the following requirements must be met:

> An eligible program must have a "substantiated completion (graduation) rate of at least 70 percent.." 20 U.S.C. § 1088 (b)(2)(A)(i); 34 C.F.R. § 668.8(e)(i).

36. Defendant SUO does not have a substantiated completion (graduation) rate of at least 70 percent.

37. Indeed, when a prospective student/lead asks an admissions representative for graduation statistics, Defendants tell admissions representatives to state the following:

> According to regulations published by the Department of Education based on the Student-Right-to-Know Act, the graduation/completion rates for first-time, full-time students who entered school in 1999 and who graduated/completed within 150 percent of the normal time to complete the program is 19%.

38. This language is problematic. It refers to a 1999 statistic; it relies on a date regarding **first-time, full-time** students, whereas, Defendants more generally recruits **"repeat," part-time** students; and the 19% is clearly below the 70% eligibility requirement mandated by the PPA of the HEA.

39. Further, Defendant does not willingly provide this skewed statistic to a prospective student/lead. Indeed, an admissions representatives is only to divulge such information *if and only if* a student or prospective student asks about the graduation rate.

40. Defendant SUO's director of admissions has announced that it only had two students who graduate since the inception of Defendant SUO.

**Count I**
**Defendant knowingly made False Statements to Obtain a False or Fraudulent Claim Payment or Approval in Violation of the False Claims Act, 31 U.S.C. §3729(a)(1).**

40. Relator Buchanan incorporates by reference Paragraphs 1-39.

41. In performing all of the acts set out above, Defendants defrauded the United States of America by knowingly presenting, or causing to be presented, to one of more officers, employees or agents of the United States of America, specifically the DOE, a false and fraudulent claim for payment or approval, in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1).

42. As a direct result of Defendants' intentionally false certified statement, the DOE provided Defendants with a benefit in the form of Federal Funding.

43. Furthermore, Defendants' false statements and conduct were material in that they directly caused the DOE to pay out money to Defendants.

**Count II**
**Defendant Knowingly Made False Statements to Get a False or Fraudulent Claim Paid or Approved in Violation of the False Claims Act, 31 U.S.C. □ 3729(a)(2).**

44. Relator Buchanan incorporates by reference Paragraphs 1-43.

45. As set forth above, Defendants have knowingly made, used, or caused to be made or used, a false record or statement to obtain a false or fraudulent claim payment or approval by the United States of America, specifically the DOE, in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(2), and damaged the treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

46. As a direct result of Defendants' intentionally false certified statement, the DOE provided Defendants with a benefit in the form of Federal Funding.

47. Furthermore, Defendants' false statements and conduct were material in that they

directly caused the DOE to pay our money to Defendants.

**Prayer for Relief**

WHEREFORE, Plaintiffs request the following relief:

a. Judgment in favor of the United States of America against Defendants, by reason of the violations of the False Claims Act as set forth above, in an amount equal to three times the amount of damages the Untied States has sustained because of Defendant's actions, plus a civil penalty of not less than Five Thousand Dollars ($5,000.00), and not more than Ten Thousand Dollars ($10,000.00), for each violation, plus three times the amount of damages which the United States Government has sustained, pursuant to 31 U.S.C. § 3729(a);

b. Award to Relators, as the *Qui Tam* Plaintiffs, of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act on the United States' recovery;

c. Award Relators all reasonable expenses the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;

d. Punitive damages on all causes of action, to the extent allowable by law; and

e. Such other and further relief as the Court deems proper.

Respectfully submitted,

**Ogg, Cordes, Murphy & Ignelzi**

/S/ Samuel J. Cordes
Samuel J. Cordes
Tiffany R. Waskowicz

Pa. I.D. No. 54874 (Cordes)
Pa. I.D. No. 202933 (Waskowicz)

245 Fort Pitt Boulevard
Pittsburgh, PA 15222
(412) 471-8500

Attorneys for Plaintiff